UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANTOINE JACKSON,

     Plaintiff,

v.

FIAT CHRYSLER
AUTOMOBILES,

     Defendant.

Case No. 19-11328
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT [24]

---

Plaintiff Santoine Jackson filed this suit after Defendant Fiat Chrysler Automobile (FCA) suspended him for three days for reportedly refusing to perform certain duties in his job at the Trenton Engine Plant. (ECF No. 1, PageID.3–4.) Jackson alleges that FCA discriminated and retaliated against him at work because he is African American. However, Jackson has offered no evidence that race was a factor in his suspension. The Court will grant summary judgment for FCA.

### I. Background

All of the following facts are undisputed except where expressly noted.

Jackson was hired as a line worker at FCA in May 2013 in the Trenton Engine Plant, where he continues to work today. (ECF No. 24-2, PageID.125, 127.) In 2015, Jackson applied and was hired as a Team Leader. (ECF No. 24-

2, PageID.129, 134.) The job description states that Team Leaders "fill in on operations when needed" and "fill in for absent Team Members until personnel can be backfilled if possible." (ECF No. 24-4, PageID.279.) In his deposition, Jackson agreed that in addition to his regular duties, as Team Leader he performed "Jobs that needed to be covered, whatever day that they needed to be covered." (ECF No. 24-2, PageID.131.) A Team Leader receives additional pay. (*Id.* at 134.)

On two occasions prior to this suit, Jackson refused a task assigned by his supervisors—he argues that management had not managed staffing properly—and ultimately received a three-day suspension as a result. The collective bargaining agreement between FCA and the United Auto Workers (UAW) provided for a disciplinary procedure that progresses in severity. (ECF No. 24-6, PageID.295.) A first violation receives a Verbal Warning; a second violation receives a Written Warning; a third receives a Written Warning with Counseling; a fourth receives a 3 Working Day suspension; a fifth receives a 30 Calendar Day suspension; a sixth violation results in discharge. (*Id.*) The disciplinary progression guidance does not state whether multiple violations in a single incident are counted as a single violation. (ECF No. 24-6, PageID.295.) The policy states: "Circumstances will arise which necessitate corrective disciplinary action that may not follow the standard progression

guidance. Disputes regarding disciplinary matters may be addressed through the [standard union] grievance procedure." (*Id.*)

Jackson's first violation occurred on April 5, 2016, when he refused to change tapes for the Op160 machine while the crank line was understaffed due to holiday and FMLA leave taken by fellow employees. (ECF No. 24-8, PageID.30.) Jackson's supervisor, Jake Tompkins (who is white),[1] attempted to call in three off-duty employees to staff the machine, but none answered. (*Id.*) The Op160 tapes went unchanged for two hours. (*Id.*) In his Supervisor's Report, Tompkins recounted that Jackson claimed he did not know how to operate the machine and that he was not certified to operate it. (*Id.*) Jackson also testified at his deposition that he was not certified in the Op160. (ECF No. 24-2, PageID.196.) After Tompkins issued a Supervisor's Report recommending a verbal warning on April 16, 2016, FCA formally issued Jackson the Step 1 Verbal Warning on May 5, 2016, for violating Standard of

---

[1] FCA notes the race of each of Jackson's supervisors in its motion. (ECF No. 24.) While that information is sometimes relevant in race discrimination cases, Jackson refused to identify the race of any of his supervisors at his deposition. (*See* ECF No. 24-2, PageID.163, PageID.175, PageID.178–179; *id.* at PageID.179 (Jackson: "I don't have any opinion on anyone else's race.").) And Jackson does not identify any specific supervisor that allegedly acted with racial animus or bias towards him. (*See, e.g.*, ECF No. 24-2.)

Conduct #5 (Failure to exert normal effort on the job). (ECF No. 24-8, PageID.30.)[2]

A second incident occurred on April 15, 2016, when Jackson submitted Quality Deviation paperwork—also known as an "LPA"—listing incorrect or incomplete information in eight sections. (ECF No. 24-9, PageID.307.) Rather than reviewing the specific checks for each of the eight Operations, Jackson wrote "OK" or "N/A" in large letters across the page. (*Id.* at PageID.309.) If this was a typical method of submitting quality checks for fully compliant operations, Jackson has not argued so. In any event, FCA viewed this as a breach of his duties. Tompkins issued a Supervisor's Report on April 29, 2016, stating, "Upon reviewing his LPA it is clear that Mr. Jackson put forth little effort to properly complete the form" and "showed a complete disregard for his duties as Team Leader." (*Id.* at PageID.307.) Tompkins recommended a Step 2 Written Warning for violation of Standard of Conduct #1 (Providing false and/or misleading information to the Company) and Standard of Conduct #5 (Failure to exert normal effort on the job). (*Id.*) FCA formally issued the Step 2 Written Warning to Jackson on May 12, 2016. (*Id.*)

---

[2] Jackson was read the verbal warning on May 5, 2016, but the Court notes for clarity that the Supervisor's Report recommending the discipline was dated April 21, 2016. (ECF No. 24-8, PageID.304.)

4

On October 25, 2018, Jackson again refused to cover a machine during a manpower shortage. On that day, Jackson's supervisors were Tompkins and Rodney Williams (who is African American). (ECF No. 24-5, PageID.28; ECF No. 24-2, PageID.177.) Jackson was the only Team Leader available during the shift (ECF No. 24-10, PageID.311) and he was certified for this machine, the Op40/50 (ECF No. 24-2, PageID.205). In Jackson's view, this was not his responsibility: "That team leader not being there is a supervisor problem, not a Santoine [Jackson] problem, because I'm at work on my end doing my job." (ECF No. 24-2, PageID.205.) Jackson had started that workday on another part of the crankline (the "finish end" of the line), and, as the Team Leader posted to the finish end, Jackson believed that was his sole responsibility. He testified at his deposition: "I don't have to do anything on the rough end if I'm the team leader on the finish end." (ECF No. 24-2, PageID.204.) Jackson also believed that once he had been posted to one machine for an hour, he could not be "forced" to another machine. (*Id.* at PageID.204–205.) But Jackson could not cite any specific rule for that belief and there is no support in the record. (*See id.*)

When Tomkins and Williams asked Jackson to cover the Op 40/50, Jackson told the supervisors to call his union steward. (ECF No. 24-2, PageID.204.) Both Tomkins and Williams attempted to warn Jackson that if

he did not follow directions in a timely manner, there could be disciplinary consequences. (ECF No. 24-10, PageID.311; ECF No. 24-5, PageID.285.)

The parties disagree whether Jackson then proceeded to help on the Op 40/50. (ECF No. 24-2, PageID.204 ("I told them to call my steward and I went down there and did the job."); ECF No. 24-10, PageID.311 ("At no point while waiting for his steward did Mr. Jackson work on the Op40/50 job.").) Both supervisors believed the post went unmanned for about 90 minutes. (ECF No. 24-10, PageID.311–312 (Tompkins); ECF No. 24-5, PageID.285 (Williams).) Jackson says it was only 10 minutes. (ECF No. 24-2, PageID.229 ("I guess I didn't walk fast enough, and he said I refused. But by the time the steward came, which wasn't more than 10 minutes later, I was at the 40s and the 50s.").)

At some point—it is not clear from the record whether this was before or after the union steward arrived—Jackson suggested two other people who could cover the machine: John Kolanowski and a Brian, whose last name is unknown. (ECF No. 24-2, PageID.220.) Jackson testified that both are white. (*Id.* at PageID.221.) The supervisors rejected this proposal because, in their view, "[Jackson's suggestion] was to move four [i]ndividuals to different operations and leave a non-certified operator ([i]n-training) on the job." (ECF No. 24-10, PageID.311.) The parties dispute whether John and Brian were certified on the Op40/50. (ECF No. 24-2, PageID.226; ECF No. 24-10,

PageID.311.) But there is no dispute that John and Brian were not Team Leaders. (ECF No. 24-2, PageID.225.)

Tompkins rejected the proposal for John or Brian to help, believing that they were not certified and that it would require rearranging assignments for four people instead of one. (ECF No. 24-10, PageID.311.) According to Tompkins, Jackson never assisted with the Op 40/50; other employees stepped in until someone was called in from their day off. (ECF No. 24-10, PageID.311.) Williams gave the same testimony. (ECF No. 24-5, PageID.285 ("Eventually, an off-duty employee volunteered to come in, and took over the job.").)

Tompkins issued a Supervisor's Report on November 10, 2018, citing Jackson for three violations: Standard of Conduct #3 (Unexcused absence or tardiness from your workstation, office, assigned worksite or plant during working hours); Standard of Conduct #5 (Failure to exert normal effort on the job or sleeping on the job); and Standard of Conduct #6 (Failure or refusal to follow the instructions of management). (ECF No. 24-10, PageID.311.) Following Tompkins's recommendation, Jackson was issued a three-day work suspension on November 19, 2018. (*Id.*) (As the Court will discuss further below, the record indicates that this was only Jackson's third incident in violation of company standards of conduct and that FCA skipped one step in the disciplinary guidelines when it imposed a Step 4 discipline.)

Jackson filed a union grievance. It appears he filed the grievance on the same day he received the suspension—his statement of facts is dated November 19, 2018. (ECF No. 27-2, PageID.364.) Although the union investigation found that "[Tompkins and Williams] did not make the proper moves with in [sic] the Manpower available" and "hesitated for hours without making adjustments to run the line & Mr. Jackson was on his assigned job," the union grievance form and investigation findings do not mention anything about race. (ECF No. 24-11, PageID.319.) The UAW negotiated on Jackson's behalf and secured an agreement that the suspension without pay would stand, but the suspension would not be counted against Jackson for the purpose of calculating disciplinary steps in the event of any future infraction. (ECF No. 24-11, PageID.321.)

On January 9, 2019, Jackson filed a complaint with the Equal Employment Opportunity Commission alleging race discrimination. (ECF No. 24-15, PageID.331.) The complaint stated: "my Supervisor forced me to do a job that wasn't mine. Later, I was suspended because I had protested due to there being three white individuals that were able to perform the same task. I believe I was suspended due to my race." (*Id*.) The EEOC dismissed the allegations as inconclusive and issued a right to sue letter on February 5, 2019. (ECF No. 24-16, PageID.333.)

On May 6, 2019, Jackson filed this suit, asserting race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Michigan's Elliot-Larsen Civil Rights Act. (ECF No. 1.)

FCA now moves for summary judgment on all claims, arguing that Jackson cannot establish a prima facie case of race discrimination to support any of his claims because there is no evidence to show the suspension was racially motivated and, additionally, his three-day suspension was consistent with the disciplinary procedure under his collective bargaining agreement following a documented history of refusing to perform required tasks. (ECF No. 24.)

Although FCA's motion references events *after* Jackson filed this suit—a subsequent suspension in August 2019 and Jackson's resignation as a Team Leader in September 2019 (*see* ECF No. 24, PageID.97–99)—the only disciplinary incident at issue in this lawsuit is the 2018 suspension. Jackson's complaint and responsive briefing only assert claims regarding "what happened on October 25th [2018]." (See ECF No. 1; ECF No. 27, PageID.357.) Jackson also never amended his complaint to add any allegations from 2019 and has never presented a right to sue letter for any incident other than the 2018 suspension. *See Cox v. City of Memphis*, 230 F.3d 199, 201–02 (6th Cir. 2000) (a Title VII plaintiff must timely file a charge with the EEOC within 180 days after the alleged unlawful employment practice in order to file suit)).

9

So the Court proceeds to consider the merits of Jackson's claims with respect to the 2018 suspension only. The parties have provided complete briefing that enables resolution of the motion without the need for further argument. *See* E.D. Mich. LR 7.1(f).

## II.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing that there is no material factual dispute rests with the movant, FCA. *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014). If the moving party satisfies this initial burden, "the non-moving party must then 'come forward with specific facts showing that there is a genuine issue for trial.'" *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## III.  Title VII

The Court first addresses Jackson's discrimination and retaliation claims under Title VII. As the Court will explain, FCA is entitled to summary judgment on both claims.

## A. Race Discrimination

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Because there is no evidence of direct discrimination in the record,[3] Jackson's Title VII claim arises from circumstantial evidence of discrimination that is analyzed under the familiar three-step framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Briggs v. Univ. of Cincinnati*, No. 20-4133, 2021 WL 3782657, at *5 (6th Cir. Aug. 26, 2021).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing his or her prima facie case by demonstrating that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)). The burden then shifts to the

---

[3] There is no reference to race (direct or indirect) by anyone at any time in the record before the Court, other than Jackson's allegations and suspicions recounted in his deposition. Counsel for Jackson, who appears to have copied portions of her response brief from another case, states in a header: "Plaintiff's Retaliation Claim is Supported by the Emails of Defendants." (ECF No. 27, PageID.355.) But there is no mention of any such emails anywhere else in the brief or the larger record.

11

defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 707 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)). Finally, the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination. *Wright*, 455 F.3d at 707–08. When the burden shifts back to the plaintiff, "he must come forward with evidence that the defendant's reason for the employment action is false," but he "need not present independent evidence that the proffered reason is pretext for . . .discrimination." *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.")). The employer bears the burden of production at the second step, but the employee bears the ultimate burden of production and persuasion. *Hicks*, 509 U.S. at 507–08.

Jackson's argument is that FCA management understaffed the plant and then chose Jackson to pick up the slack because he is African American, not for legitimate operational reasons, and then suspended him for refusing. It

is not clear from the briefing whether Jackson views the adverse employment action as management's decision to ask him to cover the machines, or management's decision to suspend him. But because undisputed evidence indicates that covering the machine when the plant was short-staffed was part of Jackson's job responsibilities (ECF No. 24-4, PageID.279), the Court construes Jackson's brief to assert that the suspension was the adverse employment event. But taking all of the facts in a light most favorable to Jackson, a reasonable jury could not find that Jackson was treated differently than similarly-situated, non-protected employees.

### 1. The Prima Facie Case

First, Jackson cannot make a prima facie case for race discrimination because Jackson's only proposed comparators—John and Brian—were not similarly situated. This is an essential element for a Title VII race discrimination claim: the plaintiff has the initial burden of establishing his prima facie case by demonstrating that he "was treated differently than similarly-situated, non-protected employees." *Wright*, 455 F.3d at 707 (quoting *DiCarlo*, 358 F.3d at 415). "[T]o establish that an employee is an appropriate comparator, the plaintiff must demonstrate that he or she is similarly situated to the claimed comparator in all *relevant* respects." *Wright*, 455 F.3d at 710 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)) (cleaned up) (emphasis in original). "In the disciplinary context, [the

Sixth Circuit has] held that to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Wright*, 455 F.3d at 710 (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). Jackson does not identify a comparator outside the protected class who refused to work a machine and was suspended. The only comparators he offers are two white employees who were never asked to work the machines. And they were not Team Leaders, so they had different job responsibilities. So they are not similarly situated.

The correct question for the Court is whether a non-protected-class Team Leader has been asked to work a machine, certified or not, and refused, but was not disciplined. There is no evidence in the record to support that claim. (Again, Jackson's identified adverse action is the suspension, not being asked to work the machine. So the fact that two white workers, John and Brian, were not asked to work the machine, does not support Jackson's discrimination claim. There is no evidence that John and Brian ever refused to work the machine but received no discipline.) On review of the record, the Court finds just one specific example of differential treatment offered by Jackson: he states in his deposition that "[t]hey told me I couldn't read books at work," but Brian (who is white) "reads a novel every day." (ECF No. 24-2, PageID.243, PageID.246.) But Jackson admitted he did not know if Brian has also been told to stop reading on the job. (*See id.*) Construing this in Jackson's favor, the

14

Court will assume at least one incident where a supervisor selectively enforced a rule for Jackson but not for a white colleague. But that does not show that FCA or its supervisors treated Jackson differently because of his race when he was suspended for refusing to work a machine that he was certified to operate and responsible to operate according to his job description.

Because Jackson does not establish a prima facie case of racial discrimination, the Court need not proceed with the remainder of the *McDonnell Douglas* burden-shifting analysis. *See Jenkins v. Regents of Univ. of Michigan Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019) (citing *Tilley v. Kalamazoo Cty. Road Comm'n*, 777 F.3d 303, 309 n.3 (6th Cir. 2015)). But the Court notes that even if Jackson *had* established a prima facie case, Jackson has not offered any evidence to rebut FCA's legitimate and non-discriminatory reasons for the suspension.

### 2.  Legitimate & Non-Discriminatory Reasons

Even if Jackson had presented a prima facie case of discrimination, FCA has presented a legitimate, non-discriminatory reason for the work request and the suspension, supported by admissible evidence: FCA asked Jackson to perform duties for his role, for which he was certified, and he refused to do so.

Job performance issues and failure to follow procedures are legitimate and non-discriminatory reasons for adverse employment decisions. *Wright*, 455 F.3d at 707. Jackson has not disputed that he was certified for the Op 40/50

15

machine (ECF No. 24-2, PageID.205) and that as a Team Leader he was responsible to "fill in for absent Team Members." (ECF No. 24-4, PageID.279.) Indeed, while Jackson's brief purports to assert that he was not certified for the Op40/50 (ECF No. 27, PageID.349), Jackson himself testified unequivocally that he was certified for the machine (ECF No. 24-2, PageID.205) and that as Team Leader he performed "Jobs that needed to be covered, whatever day that they needed to be covered" (ECF No. 24-2, PageID.131). These are legitimate and non-discriminatory reasons for Tompkins and Williams to assign Jackson to cover the Op40/50 and then suspend him in accordance with union disciplinary procedures when he refused.

The Court notes one issue of fact that neither party has raised as a matter of clarity, though it does not alter the outcome of this opinion. It appears from the record that the 2018 incident was Jackson's third incident in violation of the standards of conduct. This suggests that FCA skipped a disciplinary step and imposed a three-day suspension (Step 4) when a third violation is subject to a "written warning with counseling" (Step 3) under the disciplinary guideline. (ECF No. 24-6, PageID.295.) As noted above, the disciplinary guideline does not state whether multiple violations in a single incident are counted as a single violation. (ECF No. 24-6, PageID.295.) Although this was Jackson's third *incident*, the Supervisor Reports list a total of six *violations* of the company standards of conduct over the course of those

three incidents. (*See* ECF No. 24-8, PageID.30 (Step 1 Verbal Warning for one violation in one incident); ECF No. 24-9, PageID.307 (Step 2 Written Warning for two violations in one incident); ECF No. 24-10, PageID.311 (Step 4 Three-Day Suspension for three violations in one incident)). But neither party has briefed this issue. Taking the record in a light most favorable to Jackson, and assuming that FCA departed from its disciplinary policy and standard practices when it skipped Step 3 and imposed a Step 4 suspension after only three incidents, there is still no evidence in the record that race was the reason that FCA skipped a step. Title VII protects against discrimination, not against managerial errors.

### 3. Pretext

With that, the burden shifts back to the Jackson. At the final step of the *McDonnell Douglass* analysis, the plaintiff "must come forward with evidence that the defendant's [proffered] reason for the employment action is false." *Sutherland*, 344 F.3d at 615 (citing *Reeves*, 530 U.S. at 148).

Jackson has not put forward any evidence that would show FCA had ulterior, racist motives. Indeed, Jackson has not pointed to any evidence of any discriminatory conduct by anyone at FCA. And the Court finds none on its own review. None of the exhibits before the Court mention race. Jackson's own union grievance form does not mention race or any other form of discrimination. (ECF No. 27-1.) Jackson's discrimination claims are circular

17

and lack specific facts. (ECF No. 24-2, PageID.233 ("Q: [W]hat specific instances of the discrimination that you allege . . . can you identify? . . . Jackson: Trenton Engine has a bad race relation problem. So they're writing people up. They're suspending people. This is all going on and we all know why. So there's a big racial problem at Trenton Engine. Q: What specific instances can you point to to support that allegation? Jackson: This specific instance right here that I'm dealing with. Q: Okay. So your specific experience. Any others? Jackson: I'm speaking about this.").

So the Court concludes that Jackson has not offered any of his own summary judgment evidence to contradict FCA's legitimate and non-discriminatory reason: Jackson was suspended because he refused a legitimate directive by his superiors. On this record, no reasonable jury could find that FCA discriminated against Jackson on the basis of race when it imposed the three-day suspension. FCA is entitled to summary judgment on his Title VII discrimination claim.

## B. Retaliation

Title VII also prohibits employers from retaliating against employees for filing complaints of discrimination. 42 U.S.C. § 2000e-2(a). Retaliation based on circumstantial evidence is also analyzed under the *McDonnell Douglas* framework. *Briggs v. Univ. of Cincinnati*, No. 20-4133, 2021 WL 3782657, at *10 (6th Cir. Aug. 26, 2021) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515

F.3d 531, 543–44 (6th Cir. 2008)); *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). To establish a prima facie case of retaliation, a plaintiff must establish that he (1) "engaged in a protected activity"; (2) his "exercise of such protected activity was known by the defendant"; (3) the defendant subsequently "took an action that was 'materially adverse' to the plaintiff"; and (4) "a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

The parties dispute whether Jackson's protected conduct—calling the FCA ethics hotline—occurred before or after the suspension. The suspension was recommended by his supervisor on November 10th and formally issued on November 19, 2018. (ECF No. 24-10, PageID.311.) Jackson alleges he called the hotline on October 29, 2018 but provides no evidence in support of that claim. (See ECF No. 1, PageID.4.) FCA provides an affidavit from a Labor Relations Manager at the Trenton Plant stating that the call was actually placed on November 26, 2018. (ECF No. 24-3, PageID.274.)

Regardless, Jackson has not offered any evidence to show that "exercise of such protected activity was known" by FCA. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). Additionally, according to an affidavit that Jackson has not disputed, Jackson did not mention race in his ethics

complaint. (ECF No. 24-3, PageID.274.) Jackson's conclusory argument—that the timing "undoubtedly show[s] that Defendants knew of Plaintiff's complaint" (ECF No. 27, PageID.358)—is not competent evidence at summary judgment. "Mere attorney argument lacking evidentiary support is not evidence." *Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, No. 16-CV-13456, 2019 WL 3068192, at *5 (E.D. Mich. July 12, 2019) (quoting *Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009)) (cleaned up).

So Jackson is unable to make a prima facie case of race-based retaliation based on his ethics hotline call. As a result, FCA is entitled to summary judgment on Jackson's Title VII retaliation claim.

## IV. Elliot-Larsen Civil Rights Act

Jackson's response brief only asserts ELCRA with respect to retaliation and largely relies on his argument regarding the Title VII retaliation claim. (*See* ECF No. 27, PageID.355–357.) So the Court construes retaliation to be Jackson's only ELCRA claim.

Because ELCRA and Title VII impose the same elements to establish a prima facie case of retaliation, *see Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021), a reasonable jury could not find that FCA retaliated against Jackson under Michigan law for the same reasons they could

not find Title VII retaliation.   FCA is entitled to summary judgment on Jackson's ELCRA claim.

## V.  Section 1981 & Hostile Work Environment Claims

FCA also moves to dismiss Jackson's Section 1981 and hostile work environment claims. (ECF No. 24, PageID.104.) FCA argues that Jackson has offered no evidence that any of the challenged incidents were based on race, and even if they were, the incidents were not severe or pervasive. (ECF No. 24, PageID.104–106.) For liability under Section 1981, race-based harassment must be "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Williams*, 643 F.3d at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The Court agrees with FCA that a suspension in November 2018, a  suspension  in September 2019, and "occasional  reminders from  his supervisors that he should complete his paperwork promptly and should not be on the phone or reading while operating machinery" are "neither severe or pervasive under  the law" and, on  this  record, lend  no  inference  of  race. (*See*  ECF No.  24, PageID.106.)

Jackson's response does not mention these claims. (*See* ECF No. 27.) So to the extent that Jackson attempts to assert a Section 1981 claim or a hostile work environment claim as stated in his complaint, he has waived those claims by  failing  to  mention  them  in  his  response  to  the  motion  for  summary

judgment. (*See* ECF No. 27.) "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)); *see also Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because [the plaintiff] failed to address it in either his response to the summary judgment motion or his response to [the defendant's] reply brief); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003) (finding that the plaintiff's failure to brief issues relating to one of its claims in the district court amounted to an abandonment of that claim). FCA is therefore entitled to summary judgment on Jackson's Section 1981 and hostile work environment claims.

## VI.  Conclusion

For the reasons stated, FCA's motion for summary judgment (ECF No. 24) is GRANTED.

SO ORDERED.

Dated: September 13, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

22